IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:23-CV-655-FL

| ALAN BRENT WILKINS, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| CONSOLIDATED COMMUNICATIONS HOLDINGS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the court on defendant's motion for summary judgment (DE 23). The motion has been fully briefed and the issues raised are ripe for ruling. For the following reasons, defendant's motion is granted.

**STATEMENT OF THE CASE**

Plaintiff commenced this action November 15, 2023, wherein he asserts six claims, all under North Carolina law: 1) violation of the North Carolina Wage and Hour Act, N.C. Gen. Stat. § 95-25.1 et seq. (the "NCWHA"); 2) breach of contract/breach of the covenant of good faith and fair dealing; 3) breach of contract accompanied by fraud; 4) unjust enrichment; 5) wrongful discharge in violation of public policy; and 6) negligent misrepresentation. Plaintiff seeks compensatory, punitive, and liquidated damages, plus fees and costs.

Following a period of discovery, defendant filed the instant motion for summary judgment. Defendant relies on a statement of material facts ("SMF") and appendix containing the depositions

of plaintiff and three of its employees: Brian Lee Carr ("Carr"), Greg Flanagan ("Flanagan"), and Pam Lehrke ("Lehrke").

Plaintiff's response in opposition places reliance upon a responsive statement of material facts, and his statement of additional material facts, containing the same depositions and internal communications from defendant produced in discovery.

## STATEMENT OF FACTS

Defendant is a corporation headquartered in Illinois which operates in the internet and telecommunications sectors, and for which plaintiff worked. (Compl. (DE 3) ¶¶ 1–2).

During plaintiff's job interview with defendant in January, 2021, a representative of defendant told plaintiff that his base salary would be $120,000.00, with the opportunity to earn commissions in a business development role. (Def's SMF (DE 25) ¶ 1). During the same interview, defendant's representative stated that there was no cap on commissions, but did not discuss commissions for particular deals or defendant's commission structure. (Id. ¶ 2). Plaintiff received an offer letter dated February 1, 2021, outlining terms of at-will employment, including a base salary, but with no reference to commissions. (Id. ¶ 3). Around the same time, plaintiff received a separate document from defendant that outlined "at risk" commissions in the amount of $93,750, based on a goal of 100% of $5 million in revenue. (Id. ¶ 4).

Plaintiff began his employment February 22, 2021. He reported to Flanagan, "vice president of wholesale services and business development," who in turn reported to Carr, then "senior vice president of carrier sales." (Id. ¶ 5). Plaintiff was initially hired for the purpose of selling excess capacity fiber to other carriers, though plaintiff contends he was also hired to develop new business. (Id. ¶ 6; Pl's SMF (DE 32) ¶ 6). Throughout 2021, plaintiff earned commissions for making sales. (Def's SMF ¶ 7). Defendant tracked its commissions through a

1

software platform named Salesforce, in which defendant's employees could see their commissions. (Id. ¶¶ 8–9). Plaintiff contends that some, but not all, commissions were tracked through Salesforce, and notes that employees could not see their potential commission on any given transaction. (Pl's SMF ¶ 9). Salesforce was maintained by Lehrke, another employee of defendant. (Def's SMF ¶ 8).

In November, 2021, plaintiff became involved in a transaction by which defendant sought to sell 49 wireless towers across 22 states (the "TowerCo Deal"). (Id. ¶¶10–11). Some, though not all, of the towers were no longer generating any revenue, and 12 had physically collapsed. (Id. ¶ 11; Pl's SMF ¶ 11). Plaintiff believed he would receive a commission on the TowerCo Deal, structured similarly to a commission he had received on another recent transaction, though he never received any affirmative communication from defendant to this effect. (Def's SMF ¶ 12; Pl's SMF ¶ 12). Plaintiff received a 2022 sales commission plan from defendant's director of compensation on July 14, 2022. (Def's SMF ¶ 13). Plaintiff declined to sign the plan until compensation for the TowerCo Deal was agreed upon, because plaintiff believed defendant had sent the plan shortly before the first step in the closing of the TowerCo Deal in an effort to reduce his commission. (See Def's SMF ¶ 14; Pl's SMF ¶ 14). Plaintiff testified that he received a sales commission plan in 2021, and believed the 2022 edition was "probably the same thing," though plaintiff now notes that he was never placed under any such plan for 2021. (Def's SMF ¶ 16; Pl's SMF ¶ 16).

On September 20, 2022, plaintiff requested a "refresher" from Lehrke on the Salesforce platform, as his "focus" was on "infrastructure and most recently asset sales." (Pl's SMF ¶ 17). Lerhke had never seen an asset sale inside Salesforce. (Id. ¶ 18). The first part of the TowerCo Deal closed on September 23, 2022, and plaintiff had discussions with defendant about

compensation for the transaction. (Def's SMF ¶¶ 19–20; Pl's SMF ¶¶ 19–20). Eventually, Carr told plaintiff on October 2, 2022, that compensation for the TowerCo Deal would be $80,000.00, which plaintiff called "laughable" before demanding over $400,000.00 instead. (Pl's SMF ¶ 20). Plaintiff emailed Lerhke the next day about the TowerCo Deal, in which he referenced "the same percentage" as the commission from another, earlier transaction in 2021. (Def's SMF ¶ 21).

Plaintiff emailed Carr and Flanagan on October 4, 2022, with a counter-proposal of a 1% commission together with a promotion and an increase in base salary. (Def's SMF ¶ 23). Flanagan indicated a willingness to continue discussions. (Id.). Plaintiff repeated the counter-proposal on October 11, 2022, and noted that because the TowerCo Deal was an "asset sale," it could not be entered into Salesforce. (Id. ¶ 25). Plaintiff asserts that he characterized the transaction as an "asset sale" only once defendant's leadership characterized it as such. (Pl's SMF ¶ 25). On October 17, 2022, Carr emailed his superiors with recommendations for discretionary bonuses for employees who had worked on the TowerCo Deal, including a $140,000.00 bonus for plaintiff. (Def's SMF ¶ 26). The email also noted that, if the TowerCo Deal had been a commissionable transaction, plaintiff would have been owed a commission of approximately $430,000.00. (Id. ¶ 27). Plaintiff continued to seek clarification on his compensation for the TowerCo Deal through October, 2022. (Id. ¶¶ 28–30).

Ultimately, defendant decided to reduce the total discretionary bonus pool for the TowerCo Deal to $230,000.00 of which $60,000.00 would go to Carr, which reduced plaintiff's bonus from $140,000.00 to $100,000.00. (Id. ¶ 31). Plaintiff received this payment on November 23, 2022. (Id. ¶ 32). The parties dispute whether defendant had ever paid commissions on asset deals before, or whether special compensation for such transactions was entirely discretionary. (Id. ¶ 33; Pl's

SMF ¶ 33). They further dispute how much revenue plaintiff generated for defendant in 2022. (Def's SMF ¶ 38; Pl's SMF ¶ 38).

On March 8, 2023, Flanagan terminated plaintiff effective June 20, 2023. The parties dispute whether this termination was part of a larger, company-wide reduction in force. (Def's SMF ¶ 40; Pl's SMF ¶ 40).

## COURT'S DISCUSSION

A.   Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Once the moving party has met its burden, the non-moving party must then "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (holding that a factual dispute is "material" only if it might affect the outcome of the suit and "genuine" only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party).

"[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. In determining whether there is a genuine issue for trial, "evidence of the

non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's] favor." Id. at 255; see United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion.").

Nevertheless, "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the [factfinder] when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 241 (4th Cir. 1982). Thus, judgment as a matter of law is warranted where "the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture." Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005). By contrast, when "the evidence as a whole is susceptible of more than one reasonable inference, a [triable] issue is created," and judgment as a matter of law should be denied. Id. at 489-90.

B. Analysis

Defendant moves for summary judgment against all of plaintiff's claims. The court considers them in the order presented in plaintiff's complaint.

1. Violation of the North Carolina Wage and Hour Act

Defendant challenges plaintiff's NCWHA claim on multiple grounds, contending that plaintiff was not entitled to any commission on the TowerCo Deal and that, even if he had been, it provided notice adequate under the NCWHA. The court agrees with the latter point.

The NCWHA prohibits an employer from reducing wages without a written notice to the employee at least one pay period in advance. N.C. Gen. Stat. § 95-25.13(3). "Wages," as used in

5

this statute, include commissions if the employer had a policy or practice of paying them.  Id. § 95-25.2(16).

Plaintiff claims that defendant violated the NCWHA by cancelling the commission due on the TowerCo Deal, because it had a policy and practice of paying commissions on similar transactions.  Defendant disagrees, and the primary dispute on this claim, upon which the parties spill much ink, is what categories of transactions were commission-eligible under defendant's policies and practices, and whether the TowerCo Deal fits into at least one such category.  However, the court need not address this thorny question because defendant is correct that, assuming the TowerCo Deal was otherwise commission-eligible, it provided the requisite notice that plaintiff would receive no commission thereon.

As noted, the NCWHA requires written notice to an employee about any reduction in compensation at least one pay period in advance.  N.C. Gen. Stat. § 95-25.13(3).  Plaintiff received his pay every two weeks.  (Pl's Dep. (DE 33-2) 312).  The TowerCo Deal closed in two phases, one on September 23, 2022, and the other in December, 2022.  (Def's SMF (DE 25) ¶ 19; Pl's SAMF (DE 33) ¶ 20).  So, defendant had to provide notice to plaintiff of any modification to its commission practice at least two weeks before September 23, 2022.  Defendant provided a "Sales Commission Plan" to plaintiff on July 14, 2022.  (Def's SMF ¶ 13).  That plan identified three, and only three, categories of transactions for which plaintiff could receive a commission, and plaintiff acknowledged in his deposition testimony that the TowerCo Deal was not within any.  (See Pl's Dep. (DE 33-2) at 139–47).  Plaintiff received this document more than two weeks before September 23, 2022, the earliest any possible commission could have been due.  (Pl's SMF ¶ 13).

Plaintiff offers four responses.  First, he points to the absence of language in the Sales Commission Plan expressly disclaiming defendant's obligation to pay commissions, except for a

clause excluding commissions not earned by plaintiff before his last day of employment. This argument is ineffective. Plaintiff is correct that the Sales Commission Plan contains no language expressly excluding any commission for the TowerCo Deal, but it defined only three categories of transactions on which commissions could be earned. (Pl's Dep. Ex. 7 (DE 26-1) 292–94). Plaintiff testified at his deposition that the TowerCo Deal did not fit within any. (See Pl's Dep. at 139–47). For example, when asked to confirm that the TowerCo Deal did not fall into the third such category, plaintiff responded "correct." (Id. at 147). The Sales Commission Plan operated to exclude commissions on the TowerCo Deal by placing it outside its definition of a commission-eligible transaction, notwithstanding the absence of express exclusionary language particular to that deal.

Second, plaintiff points to internal characterization by defendant's other employees of another transaction, which plaintiff asserts was materially similar to the TowerCo deal, as commission-eligible. However, the record evidence demonstrates that defendant's employees recognized this transaction was not within the terms of the Sales Commission Plan's definition of a commission-eligible transaction, but elected to pay a commission on it anyway to ensure successful completion of the sale. (See Flanagan Dep. 107–108). This subsequent decision, made on a project-by-project basis, did not nullify the Sales Commission Plan. Even if this decision reflected a decision to discard the Sales Commission Plan and to overhaul employee compensation, plaintiff produces no evidence that the decision occurred any earlier than February, 2023, months after the final closure of the TowerCo Deal, to which the Sales Commission Plan applied. (Pl's SMF Ex. E (DE 33-6) 7).

7

Third, plaintiff asserts that defendant had a blanket policy of paying commissions on all sales. Even assuming the Sales Commission Plan did not supersede this policy, this argument mischaracterizes the evidence.

Plaintiff first relies upon statements made during his interview with defendant, but admits that no discussion of commissions on "particular deals or [defendant's] commission structure" occurred during that meeting. (Def's SMF ¶ 2; Pl's SMF ¶ 2). Plaintiff also relies upon deposition testimony from one of defendant's employees to argue that he received commissions on all sales. However, the testimony in question is merely that plaintiff received some form of compensation for all his sales, not commissions in particular. (Flanagan Dep. 110–111). Indeed, plaintiff received a discretionary bonus for the TowerCo Deal. (Pl's SMF ¶ 32).

Finally, plaintiff objects that he never signed the Sales Commission Plan. This argument does not succeed either. The plain language of the statute requires an employer to provide written notice of a change in wages, not for the employee to consent to such change. N.C. Gen. Stat. § 95-25.13(3).

The court therefore concludes, as a matter of law, that defendant did not violate the NCWHA because it provided NCWHA-conforming notice that plaintiff would not receive a commission on the TowerCo Deal. Summary judgment in defendant's favor is warranted.

2. Breach of Contract

Defendant requests summary judgment against plaintiff's breach of contract claims.[1] The court agrees that summary judgment on these two claims is proper.

---

[1] Plaintiff's second claim is for breach of contract and breach of the covenant of good faith and fair dealing, while his third claim is for "breach of contract accompanied by fraud." (Compl ¶¶ 46–62). The parties do not distinguish between these two claims in their briefing.

8

Under North Carolina law, a claim for breach of contract requires only 1) existence of a valid contract; and 2) breach of the terms thereof. Wells Fargo Ins. Servs. USA, Inc. v. Link, 372 N.C. 260, 276 (2019). Defendant argues that there was no contract to pay plaintiff a commission on the TowerCo Deal. The court agrees.

Defendant points to the Sales Commission Plan and plaintiff's offer letter to establish that it was under no contractual obligation to pay a commission on the TowerCo Deal. Indeed, plaintiff's offer letter does not discuss commissions at all, much less what specific transactions were commission-eligible. (Lehrke Dep. (DE 33-2) at 312–13). In response, plaintiff asserts, summarily and without citation, that an unspecified employment contract governed the parties' relationship. (Pl's Br. 8). This bare assertion does not satisfy plaintiff's burden to create a genuine issue of material fact. See Anderson v. Diamondback Inv. Grp., LLC, 117 F.4th 165, 174 (4th Cir. 2024).

Plaintiff also relies upon the same evidence as he used to support his NCWHA points. As under that claim, plaintiff relies upon: 1) deposition testimony that plaintiff would receive some form of compensation for all his sales, though he received a discretionary bonus for the TowerCo Deal, (see Flanagan Dep. 110–111); 2) the Sales Commission Plan, which excluded the TowerCo Deal from its definition of a commission-eligible transaction, (see Pl's Dep. 139–47); and 3) an employee of defendant referring to another transaction as commission-eligible, despite its exclusion under the Sales Commission Plan, as a matter of discretion. (See Flanagan Dep. 107–108). These arguments do not demonstrate the existence of any contract obliging defendant to pay a commission on the TowerCo Deal.

Next, plaintiff points to a statement from his supervisor during a performance review that plaintiff had generated $21 million in "TCV," which stood for "total contract value." (Pl's SAMF

9

¶ 7; Pl's Dep. Ex. 6 (DE 26-1 at 283)). However, this employee clarified that the TCV goal was specific to dark fiber and conduit sales, and that nothing in the performance review was compensation-related. (See Flanagan Dep. at 55, 122). The existence of the word "contract" in a performance metric does not demonstrate the existence of any contract to pay a commission on the TowerCo Deal. Finally, plaintiff relies upon his own subjective understanding that he was owed commissions on all sales. (Pl's Dep. 55). However, the formation of a contract under North Carolina law requires mutual assent to a proposed contract's terms. E.g., Creech v. Melnik, 347 N.C. 520, 527 (1998). Plaintiff produces no evidence that defendant ever assented to plaintiff's understanding of his compensation.

Because plaintiff fails to establish the existence of any contract obliging defendant to pay a commission on the TowerCo Deal, plaintiff's claims for breach of contract fail.

3. Unjust Enrichment

Unjust enrichment under North Carolina law requires the plaintiff to have 1) conferred a benefit on the other party, 2) not through interference in the other party's affairs, 3) not gratuitously, 4) with measurable value, which 5) the defendant consciously accepted. Krawiec v. Manley, 370 N.C. 602, 615 (2018); JPMorgan Chase Bank, Nat'l Ass'n v. Browning, 230 N.C. App. 537, 542 (2013).

Plaintiff's unjust enrichment claim rests upon an unclear theory. Plaintiff appears to argue that the benefit in question was the profit defendant reaped on the TowerCo Deal, which was unjust to plaintiff because defendant misled him into foregoing other sales opportunities.

The ample compensation paid to plaintiff defeats this claim. North Carolina courts uniformly characterize unjust enrichment as a claim requiring the recipient to retain a benefit "without compensating" or repaying the plaintiff, "which would render it unjust for the [defendant]

to keep the benefit." Wright v. Wright, 305 N.C. 345, 353 (1982); e.g., Browning, 230 N.C. App. at 542 ("the doctrine of unjust enrichment was devised by equity to exact the return of . . . benefits received . . . without the contributor being repaid or compensated"); Collins v. Davis, 68 N.C. App. 588, 591 (1984) (same); Relation Ins., Inc. v. Pilot Risk Mgmt. Consulting, LLC, 2024 NCBC 46, at *41 (N.C. Bus. Ct. 2024) ("the law will imply a promise to pay a fair compensation"); In re Southeastern Eye Ctr., 2019 NCBC 28, at *36 (N.C. Bus. Ct. 2019) (same). But here, plaintiff received compensation beyond his base salary in the form of the largest discretionary bonus ever paid by defendant. (See Def's SMF ¶ 33; [2] Carr Dep. (DE 33-3) at 234–235). This bonus defeats plaintiff's unjust enrichment claim., which requires an unfair lack of compensation. E.g., Wright, 305 N.C. at 353; In re Southeastern Eye Ctr., 2019 NCBC 28, at *36.

Finally, plaintiff's argument that the TowerCo Deal induced him to forego unspecified other opportunities, thereby constituting inequitable conduct sufficient to salvage the claim, fails. Plaintiff cites no authority that supports such a theory under North Carolina law, and the court's research has revealed none.[3] But even assuming the validity of this theory, the undisputed evidence, including plaintiff's own deposition testimony, demonstrates that plaintiff worked on the TowerCo Deal because he had no other sales opportunities. (Pl's Dep. Ex. 6 (DE 26-1) at 288); Flanagan Dep. 124).

---

[2] Plaintiff's statement of material facts states "denied" vis-à-vis this paragraph, but plaintiff's response elaborates his disagreements, which all have to do with the categorization of certain transactions. Plaintiff's response does not deny the payment of a bonus or its amount. (Pl's SMF ¶ 33); Wai Man Tom v. Hosp. Ventures LLC, 980 F.3d 1027, 1037 (4th Cir. 2020) ("conclusory . . . denials, without more, are insufficient to preclude [summary judgment]").

[3] Indeed, authority from other states rejects such theories presented to support unjust enrichment, see Pettersen v. Monaghan Safar Ducham PLLC, 256 A.3 604, 611 (Vt. 2021); Waage v. Borer, 525 N.W.2d 96, 99 (Wis. Ct. App. 1994), as well as the similarly equity-based claim of promissory estoppel. See, e.g., Barber v. SMH (US), Inc., 509 N.W.2d 791, 797 (Mich. Ct. App. 1993); Hanly v. Riverside Methodist Hosp, 603 N.E.2d 1126, 1131 (Ohio Ct. App. 1991).

11

Summary judgment in favor of defendant on plaintiff's unjust enrichment claim is therefore warranted.

4.      Wrongful Discharge in Violation of North Carolina Public Policies

This claim rests upon the Retaliatory Employment Discrimination Act, N.C. Gen. Stat. § 95-240 et seq. ("REDA"), which prohibits employers from retaliating against employees for, among other conduct, seeking compensation owed. See id. § 95-241(a)(1)(b).[4]

To establish such a claim, a plaintiff must show 1) that he exercised rights listed in REDA; 2) he suffered an adverse employment action; and 3) the alleged retaliatory action was taken because the employer exercised his rights under REDA. See id.; Wiley v. United Parcel Serv., Inc., 164 N.C. App. 183, 186 (2004); cf. Abels v. Renfro Corp., 335 N.C. 209, 216 (1993) (evaluating a claim under N.C.G.S. § 97–6.1, which statute REDA replaced). Defendant argues that plaintiff did not engage in protected activity under REDA, and that even if he had, no causal connection between the protected activity and plaintiff's termination exists. The court agrees that plaintiff engaged in no protected activity.

Plaintiff points to repeated emails and other communications from plaintiff to his supervisors requesting a commission on the TowerCo Deal, and expressing dissatisfaction about his compensation for the same. (See Pl's SMF ¶¶ 19, 29, 40; Pl's SAMF ¶ 24). But REDA only protects, as relevant here, the "fil[ing] of a claim or complaint, initiat[ing] any inquiry . . . or testify[ing]," as to statutory rights including the NCWHA. N.C. Gen. Stat. § 95-241(a)(1)(b). Courts have repeatedly held that internal complaints to supervisors such as plaintiff alleges here are not protected activity under REDA, because this statutory language does not cover oral or

---

[4] In his complaint, plaintiff cites N.C. Gen. Stat. § 95-25.1, the policy statement and short title section of the NCWHA, and alludes to terminating employees who oppose violations of that statute. (Compl. ¶¶ 67–70). Plaintiff's briefing clarifies that this claim rests upon the anti-retaliation provisions of REDA, which protect rights asserted under, among other statutes, the NCWHA. (See Pl's Br. 11–13).

12

informal actions, or those which are made only to an employee's managers or supervisors. See, e.g., Pierce v. Atl. Grp., Inc., 219 N.C. App. 19, 28 (2012) (dismissing REDA claim where the "[p]laintiff spoke only to his supervisors about his concerns"); Sanders v. Waffle House, Inc., No. 5:21-cv-485-FL, 2023 WL 2587479, at *6 (E.D.N.C. Mar. 21, 2023) (rejecting complaints "about [employee's] hours being wrong" on her paycheck as protected activity); Matthews v. Herc Rentals Inc., No. 7:21-cv-89-BO, 2023 WL 8190155, at *5 (E.D.N.C. Nov. 27, 2023) (informal complaints to supervisor not protected); Davis v. Cap. Ready Mix Concrete, LLC, No. 5:21-cv-463-D, 2023 WL 7346060, at *8 (E.D.N.C. Nov. 7, 2023) (similar).[5]

Plaintiff's only alleged protected activities were internal complaints to his supervisors about his compensation, which did not lead to any investigation, which are not protected by REDA. This claim therefore cannot rest upon these complaints.

Finally, plaintiff appears to argue, as an alternative theory of his wrongful discharge claim, that it can proceed because defendant falsely ascribed his termination to a budget-induced reduction in force, rather than to his commission complaints. (Pl's Br. 12–13). However, North Carolina is an employment-at-will state, in which an employer may terminate an employee for "no reason, or for an arbitrary or irrational reason[.]" Coman v. Thomas Mfg. Co., Inc., 325 N.C. 172, 175 (1989).[6] If defendant lied about why it terminated plaintiff, such behavior may not be admirable employment conduct, but it cannot support a wrongful discharge claim under North Carolina law. E.g., id.

---

[5] The Supreme Court of North Carolina has not addressed the issue, see Davis, 2023 WL 7346060, at *8, so the court consults decisions from the North Carolina Court of Appeals and federal courts applying North Carolina law.

[6] Coman noted a narrow exception to this doctrine under which an employer cannot terminate an employee for refusing to engage in criminal conduct, in that case perjury, but such concerns are clearly absent from this case.

Because plaintiff engaged in no REDA-protected activity, and because defendant's alleged falsehoods about why it terminated plaintiff cannot support a wrongful discharge claim, summary judgment against this claim is warranted.

5. Negligent Misrepresentation

Defendant argues that plaintiff's claim for negligent misrepresentation fails for, among other reasons, lack of justifiable reliance by plaintiff. The court also agrees.

To establish a claim of negligent misrepresentation, a plaintiff must 1) justifiably rely to his detriment 2) on information prepared without reasonable care 3) by one who owed the relying party a duty of care. Dallaire v. Bank of Am., N.A., 367 N.C. 363, 369 (2014).

Plaintiff relies upon statements about his compensation made during his interview, as well as portions of testimony discussed above with reference to plaintiff's other claims. Defendant contends that plaintiff could not have justifiably relied upon any of these statements to form the belief that he was owed a commission on the TowerCo Deal.

First, plaintiff admits that no discussion of commissions on "particular deals or [defendant's] commission structure" occurred during his job interview. (Def's SMF ¶ 2; Pl's SMF ¶ 2). Second, plaintiff points to other pieces of evidence already discussed above: 1) his own subjective understanding of defendant's commission structure, and 2) a statement that plaintiff received some form of compensation for all his transactions. (Pl's SAMF ¶¶ 3–8). But plaintiff's subjective understanding of his commission eligibility logically cannot support the justifiable reliance element of negligent misrepresentation, as that tort revolves around information provided by another. Dallaire, 367 N.C. at 369. And as discussed above, the other testimony on which plaintiff relies was that he would receive some form of compensation for all his sales, as he did for the TowerCo Deal in the form of a discretionary bonus. (See Flanagan Dep. 34, 110–111).

The court therefore agrees with defendant that plaintiff could not have justifiably relied upon any of these statements, and that summary judgment in its favor on this claim also is warranted.

## CONCLUSION

Based on the foregoing, defendant's motion for summary judgment (DE 23) is GRANTED. The clerk is DIRECTED to close this case.

SO ORDERED, this the 14th day of March, 2025.

_____
LOUISE W. FLANAGAN
United States District Judge